## M'Henry *against* M'Call.*

A deed by the commissioners authorised, by the act of March 19, 1807, to sell the lands of John Nicholson, is *prima facie* evidence of title in the grantee, without proof of any of the acts of the commissioners prerequisite to the making of a deed.

A deed of conveyance by a trustee, in whom is vested a legal title, transfers such title to the grantee, upon which he may maintain ejectment for the land conveyed; and a stranger to the trust, and one who claims adversely to it, can not set up as a defence, a violation of the rights of the *cestui que trust* in such conveyance.

It is not a valid objection to the admission in evidence of a deed of conveyance that all the title recited in it has not been previously exhibited; there is a limitation as to time, beyond which it is not necessary to go to establish a title to land in the possession of the party, or, if unimproved, under his superintendence and care, and for which he has paid taxes.

Whether a defendant in ejectment claimed adversely, or under the plaintiff's title is matter of fact which can only be determined by the jury.

ERROR to the common pleas of *Columbia* county.

This was an action of ejectment by Archibald M'Call against Samuel M'Henry and others, in which the defendant took defence for 150 acres of land.

The plaintiff gave in evidence four patents to John Nicholson, for tracts surveyed in the name of Wm Montgomery, Hannah Montgomery, John Montgomery and John Young.

The plaintiff then offered in evidence:—March 3, 1796, settlement of the account of John Nicholson by John Donaldson, comptroller-general. March 8, 1796, entered in the register-general's office, and certified by Samuel Bryan, register-general, balance 58,429 dollars and 24 cents. December 20, 1796, account settled by the register-general, balance 51,209 dollars and 22 cents. December 22, 1796, settled by the comptroller-general.

The defendant objected to this evidence:—1. Because it was not given before the arbitrators to whom the cause had been referred. 2. Because the papers were not properly certified. The court overruled the objection and sealed a bill of exceptions.

The plaintiff then offered:—Nov. 17, 1829, "Large Document" certified by James Trimble, deputy secretary, certifying a compromise between the commonwealth and M'Call, Ashley and Astley: lists of lands, &c., Cadwallader Evans, John Lyon, and Joseph Heister, commissioners of the commonwealth in the compromise. March 18, 1808, compromise:—April 4, 1808, copy of commissions

---

* This case belongs to the Sunbury Term, but was not furnished to the Reporter in time for its appropriate insertion.

from Governor M'Kean to John Ashley and Thomas Astley authorizing them to make sale of the lands, compromise, &c. Nov. 23, 1808, return of sale under the commission. June 25, 1808, deed from M'Call, Ashley and Astley to Wm J. Bell, acknowledged January 14, 1809, and recorded Nov. 20, 1813;—January 7, 1809, deed Wm J. Bell to M'Call, Ashley and Astley:—May 15, 1823, deed M'Call, Ashley and Astley, trustees of the Asylum Company of the first part, and M'Call, Ashley, Astley, and James Gibson, manager of said company of the second part, and Thomas Newman of the third part; and May 21, 1823, assignment of said deed Thomas Newman to Archibald M'Call, the plaintiff. All this evidence was objected to by the defendants; because—

1. No authority by law shown for the proceedings.

2. In the execution of the commission from Governor M'Kean, it is not shown that the proceedings have been conducted according to law.

3. That the copy of the documents certified by J. Trimble, deputy secretary, is not evidence; the original should have been produced.

4. The assignment of the lien of the commonwealth to M'Call, Ashley and Astley, is not produced.

5. No articles of association, or other evidence of the existence of such a company as the Asylum Company is produced.

6. The deed of June 25, 1808, is objected to, because there is no title shown between the patent to John Nicholson and the title of M'Call, Ashley and Astley.

7. M'Call, Ashley and Astley have shown no interest to entitle them to become parties in the lien of the commonwealth.

8. There is no authority shown by which Ashley, Astley, M'Call and Gibson, as trustees, made the deed to Newman of May 15, 1823.

9. This deed of May 15, 1823, refers to register, Alexander Montgomery and others, which is not produced.

10. The deed from Newman to M'Call shows that Newman was a trustee or agent, and his authority is not shown.

The court overruled the objections, except that to the recitals, and sealed a bill of exceptions at the request of the defendant.

The plaintiff then gave in evidence:—January 2, 1795, deed John Nicholson to Robert Morris for 37 tracts, recorded August 19, 1809. February 1798, deed Robert Morris to Jared Ingersoll and Matthew Clarkson. The defendant objected to the recitals in the deed from Morris, and the court rejected them except the reference to the twelve articles of the association for the purpose of showing the trust. The defendant excepted to the reading of this reference:—Nov. 23, 1808, deed Jared Ingersoll to M'Call, Ashley and Astley recites that the lands were vested in Nicholson and Morris and the Asylum Company. This recital was objected to by the defendant and exception was taken to its having been read.

x.—2 o*

[M'Henry v. M'Call.]

John Robbins, sworn.—Survey of Wm Montgomery, Hannah Montgomery, and John Montgomery shown witness. General diagram, marked "Jan. 25, 1840," shown witness. I made this diagram; I know the lands Samuel M'Henry occupies; the biggest part is in Wm Montgomery and Hannah Montgomery; perhaps a little and very little in John Montgomery; before Samuel M'Henry, Frederick Knowes was the first I saw in possession; I first knew it pretty well on towards 20 years; and Knowes on it; he staid till M'Henry bought him out a few years ago; perhaps five or six years; Fred. Knowes got me to come and run his land; I ran round for him, and we had some conversation; he said he had agreed with the Asylum Company, or Webb; Webb was the man; he then concluded to set up a claim of his own; and for that purpose got me to run it; he said the Company was scattered and broke up; and he did not know he could get a title from them; and he concluded to hold it for himself by possession; this must have been 15 or 20 years ago; between those years; do not recollect he said how much he had bought; he said he had agreed for the land he was on; I run by some old lines and made some new ones; where there were boundary lines I followed them; I think he said Webb had never run it for him; the land run out for Frederick Keller joins Frederick Knowes; I ran a new one on the south side of John Montgomery; I think I did not run it into John Montgomery; Frederick Knowes was there, and John Keller part of the time; some of Knowes' sons along; and several others; and all concluded that the land was abandoned by the Company, and that they would set up their own claim and hold it by possession in their own right by settlement; I never had any conversation with Frederick Knowes before that time.

Cross-examined.—Between 15 and 20 years ago, they met and concluded; it was there I ran out for several; before that I never heard Knowes say how he claimed; by these official drafts, I say Samuel M'Henry is in; I saw lines there last summer; I think we sent to Samuel M'Henry to let him know we were there; he said he did not want new marks made; very like I wanted information from him to show his lines; I could not find them; I found the official lines; Samuel would not show his draft; I ran all the official lines, including Samuel M'Henry's possession; do not recollect Frederick Knowes showed me a draft when I surveyed for him; I found old lines on the south; and on the north too; he claimed up to, if he did not run into John Montgomery; I think he did not say how long he lived on the land; I think he told me; but do not recollect; I have no recollection that Knowes said he had ever paid any thing; Knowes said he had agreed to purchase land I think for two dollars per acre; can not say when it was to be paid; nor how much land; do not recollect he said any thing about a writing signed or not one way or the other; I believe I was there last summer a year

[M'Henry v. M'Call.]

surveying at the instance of Mr. Frick; I did not finish then; this diagram is from actual survey of the lines; I ran most of them.

Samuel Webb, affirmed.—Plaintiff offered to prove by this witness that he was agent, and acted as such for the Asylum Company, and in that capacity went on this land in 1816.—Saw Frederick Knowes and agreed to sell the land in question to Knowes, and that Knowes acknowledged the title of the Asylum Company, and was holding under them.

The defendants objected—1. Because no power under corporate seal is shown, nor other power, nor written authority, nor existence of any such company.

The court overruled the objections and sealed a bill of exceptions.

Witness.—I acted as agent for the Company; my orders were sanctioned by the Company and approved by Mr Baird. In pursuance of instruction I went on the land; I saw Frederick Knowes, and asked him if he was on the asylum lands and wished to purchase; he said he was, and wished to purchase; I asked him the number of acres he wished, and if his improvement was all one; he wanted all his improvement in his survey, and I said he should have it; I asked him 2 dollars 50 cents per acre; he agreed to take it; I told him when he paid 10 per cent, then he should have a written agreement; he never paid any thing; I never surveyed it off for him; there never was any agreement made to my knowledge; that was all.

At that time Knowes set up no claim against the Asylum Company, nor at any time that I know; when he paid the 10 per cent., I was to come and survey it, and enter into an agreement; but nothing was done; I never spoke with him afterwards.

Cross-examined.—I think I never spoke with him about his claim on the title before the time I have stated.

John Kestler, sworn.—I never heard Frederick Knowes say much of any thing until after he sold; perhaps it was before defendant bought; it was 15 or 16 years ago; he then called it the company lands; his son was on them; he said it was company lands; he said he had agreed or bought, I can not say which, of Mr Webb; afterwards he said; we talked more than once; can not tell how long since, but 10 or 12 years ago; about the time he sold to M'Henry; can not say if before or after; think it was the winter he sold to Samuel M'Henry.

Peter Hodge, sworn.—I never had much connection with Knowes; he said he was living on the company lands; he did not tell me he had ever made any agreement, or was under any body; he said Webb was agent; and the company had broke so that they could not make any title; this was, I think, between 1821 and 1826, and at different times; he supposed it was the Asylum Company lands; and Webb could not do any thing more; I never heard him claim it any other way.

Cross-examined.—I never heard him say he would have a possession right.

Abraham Knowes, sworn.—About 29 or 30 years ago, father moved on the land, and was on it about four or five years then till he said Webb came on and said he was an agent and had the land for sale; so father said to me that Webb said if he purchased, he should have it for two dollars and a quarter per acre; father said if he would make him a good title he would purchase of him, and Webb never came on to make any article with him; think he said Webb said he could make him a good title; but do not know that they agreed or that they made any further bargain than that; after some time and Webb did not appear, he still held it by improvement, and said if they did not come within 21 years, he allowed he could hold it by improvement right; I do not mind that father said he had agreed further that if they made him a title he would purchase; I heard him say that more than once; I can not tell exactly when father began to think he could hold by improvement; think it was 19 or 20 years ago; we heard the company was broke; do not know that I heard father say before that he would hold by improvement; father gave up possession to Samuel M'Henry; I had rented under father; last spring I think, six years ago; possession given up to defendant by father and I; I had rented for three years, and that spring my time was out; I had 25 acres off the piece which I sold brother Frederick; I got it of father: Frederick is in possession now; father was living, the last I heard, in Ohio; during first seven years, father had about 15 or 16 acres cleared; a house was there when he came: he built a barn; can not say if before seven years out; had an orchard; some trees on it; when father first went there, and until Webb came, do not know that father knew whose land it was; father used it and worked it as his own; and as other farmers; father claimed there I think 160 acres; with the 25 acres; I sold brother the 160 acres he had run by John Robbins.

John Robbins, again.—I believe I asked defendant with the rest whether they held under their own claim or would give up; I told him Mr Frick sent me and I asked him that; they said they would hold under their own claim; I think Mr Frick told me to tell him he would give a good title clear of incumbrance, or warranty title; this was I believe last summer a year; think it was before the ejectments brought.

Cross-examined.—Do not know who was present, when I talked this; think it was at defendant's; I can not say positively that I recollect who; but think some one was with me; Samuel M'Henry objected to it; he calculated to stick to it; I recollect now being there, and I informed him; and he objected coming under Mr Frick; he said he had a better title himself; he said he had paid a large sum of money to Knowes, and made large improvements and built a house and barn; I can not perfectly recollect if John Kestler was

[M'Henry v. M'Call.]

by; but believe he was; I believe there was some such conversation as defendant saying that when he bought, Knowes had a good improvement right by 21 years.

The defendants then gave in evidence the assessment books, showing that the land had been taxed in the name of Frederick Knowes since 1812, up to the time he sold to the present defendants, and in their names since. Also the agreement of sale by Knowes to the defendants and payment of the purchase-money.

Abraham Knowes, sworn.—Diagram A B C shown witness.—I know the lines of Samuel M'Henry; this part A, is his; on the south boundary of Barber; also Fred. Knowes' 25 acres: on the west John Kestler and where John Kestler used to live; on the north adjoins Shellenburger: on the northeast corner and east lands. I have several times been along these lines. Father claimed up to these lines. I was about eight years old when father first settled there; I was thirty-eight the 20th December last; are something like 60 acres now cleared two or three years ago; orchard 100 apple trees; dwelling-house; a frame built by Samuel M'Henry; shingle roof; a cellar I believe; barn, a log one, built by father; a spring house; I got the 25 acres from father; I rented this from father about ten years ago, three years before M'Henry bought it; when father went there, there were three or four acres cleared, and a log house; father built the barn after Webb was there; when Webb was there, must have been 10 or 12 acres cleared, or more; some orchard was there, the orchard planted since; father planted a few trees and there were six or eight when he came; he planted some before Webb came, I think; Robbins surveyed when I carried chain; that is all I know of the survey; we found old marks on Barker's line, and Moravian line, and some on the north, I think, but not many; some old marks there; I recollect a pitch pine.

Cross examined.—Going up the Moravian land I cannot tell all the corners; I think I recollect a dogwood at the upper corner going up the Moravian line; then out west on the north line and joined, these lands belonged to the Company, now Henry Shellenburger's; think we started at the west corner; a post there between Keller and Kestler and this land on the west side; then along Barker's line a W O E a pine down; do not know about the upper tracts; we stopped at the dogwood and then went a straight line till we struck between Kestler and Keefer and this land; I do not know what has become of the draft Robbins made; father had it; I think Robbins' draft and this are alike; only on the north; think we did not run up so far; the Moravian land was up 20 perches to a white pine; Robbins ran straight west from the pine, and so was the draft.

John M'Henry, sworn.—I have known the land since 1798; the first improvement in 1800; one Woolen began there; he built a log house and cleared about three acres; he did not stay long and left it; when Weisner came out and did not purchase from Woolen; it lay vacant some time: about two or three years; Weisner one and

a half years; he left in the fall, and in the spring of 1809 Knowes came; he did not buy of Weisner, and continued in possession until 1831, and then left in the spring; I lived a short mile and a half from Knowes; I was intimate with him; he often worked for me, and I wrote and did business for him; he could not write English and did not talk it plain; I was not there when Knowes moved, but soon after, within two or three months; nothing said then how he claimed; nothing then about the land, but within the first year he told me without asking; said the place had laid vacant and asked me who began, and whether Woolen had purchased from any body; I told him not that I knew; he said he was informed so before he came that it was vacant and the improver would be likely to hold it if he settled on it; I cannot state just the time, but at different times; after being there four or five years he talked more about it; he said he had not been molested yet and did not know as he should be; after that at different times until Webb came it was talked of that he thought he could hold; he heard of no claims sufficient to disturb him; after Webb had been there, shortly after he said that Webb had been there, and stated he acted as agent for the Asylum Company lands, and said he told Mr Webb he was not inclined to make any agreement with any one; after he saw Webb he claimed as he had done before; nothing particular, only he claimed in the same way at different times till he sold to the same defendant; he used his timber land as all the rest of us do; made shingles and rails and staves to take to market; hauled 1000 hogshead staves once on my land, and the fire broke out and burned them; I do not know that Knowes or Samuel have had possession of any other but this 164 acres; I know the Moravian and Barker lands of old. When Samuel bought I was along where the line was run, and it came out within a few rods of where Knowes had shown me the line before. I only talked once with Samuel Webb about this at his house; he called me in; it was August a year ago; he introduced it himself about those lands; I asked him if Knowes and he ever came into any agreement about the lands; he said they had not; there was no writing nor verbal agreement; only he had offered it to Knowes for sale; I asked him if Knowes agreed with him; he said he did not, and his reason was he would not agree nor consent to buy of any one until he saw the title; I asked if he had shown the title; he said he had not; I asked how it happened he did not show the title; he said it never was invested in him to make title; he said he had written down after he saw Knowes and others on the land; that Samuel had not come under an agreement unless the title was finished; that they could see it, and he wrote down a letter to that effect; I asked if he got an answer back; he said he had; I asked if he would let me see it; he said he would if he could find it; he searched some time and could not find it, and that Mr Frick had it; if not, if he found it he would send it to me.

Defendants proposed to ask witness what Webb said as to the

contents of the letter answering his, which he said he could not find.

Plaintiff objected and the evidence was overruled by the court, to which the defendants excepted.

Witness.—About 60 acres of land cleared there; Samuel had cleared about five or six acres before the ejectment; he built a frame house after he came; a cellar and porch; orchard, apple and peach and pear, above 100 apple trees; 50 peach or more I reckon; all the purchase-money was paid to Knowes; I wrote the receipts and he signed them; 260 dollars; I generally did such business for him; I called on Mr Frick the spring before my son purchased; I did not consent that my son would purchase until he consulted counsel and I came down for my son; Knowes had stated before that he had taken counsel and they told him his improvement was good. I told Mr Frick Knowes' situation, and that he had offered to sell to my son, and he got me to come and take counsel whether the title would be good or not; Mr Frick asked how long he, Knowes, had been on the land; I told him the year as I have stated here; he asked if Knowes had come under any agreement or article or lease; I told him then what Knowes had told me had passed with Webb; that Webb had been through there and had offered to sell the land to Knowes; that he had said he would not purchase unless he would show a good title first; I told Mr Frick that he had always held and intended to hold it by improvement; Mr Frick said if I was satisfied that he never articled or came under a lease with Webb, the conversation Webb and Knowes had would avail nothing, and if my son thought the improvement worth the money there could be no risk in buying if he had been on the twenty-one years; in some instances he said they could only hold the improved part; the general course was to hold whatever was in the survey and paid taxes for; he said there would be no risk in buying; I mentioned to Mr Frick what was said as above; I did not talk with Webb till a year or two ago.

Cross-examined.—I know the Walker place was called Asylum Company lands forty years ago; I never heard anything of this tract being Company land until after Webb was up; I do not know that the adjoiners agreed with Webb; Edward M'Henry surveyed it after my son purchased; do not recollect that he marked lines but followed Robbins; only the west line was marked anew.

The court was respectfully requested to instruct the jury upon the following points:

1. That the written title exhibited by the plaintiff does not give him a right to recover, but is in itself defective.

2. That the evidence will justify the jury in finding that the possession of the defendants and Knowes was adverse to the plaintiff's title, and such as to entitle the defendant to a verdict by the statute of limitations; and that the conversation between Knowes and

Webb as stated by Webb or any other witness does not take from the defendants the protection of that statute.

3. That to deprive the defendants of the benefit of the statute of limitations, a parol acknowledgment of the adverse title must be such an acknowledgment as to show that the defendant did not intend to hold adversely to, but under the plaintiff's title, and such as to induce the plaintiff to believe that he did so hold under it.

4. That if the conversation between Webb and Knowes respecting a purchase as stated by Webb and others was with a view to compromise, the defendant is not deprived by it of the protection of the statute of limitations.

*Lewis*; president.—1. The court cannot give the answer requested, but say to the jury that the plaintiff's paper title is not in itself defective, but is a perfect title to the land unless the defendant establishes his defence upon the ground of 21 years' adverse possession before suit brought.

2. The court cannot give the instruction here requested, but on the contrary state to the jury that if they believe the evidence for the plaintiff they may properly find that the possession of Knowes was not adverse to the plaintiff's title for 21 years, but in subordination to it.

3. Answered in the affirmative.

4. This instruction refused because there is no evidence to justify such instruction.

In the general charge the judge spoke thus;—The court say to you as matter of law, that if you believe Samuel Webb, and that the transaction between him and Knowes took place as stated by Webb, then the plaintiff is entitled to recover. The court further state that if you believe from the evidence of John Robbins or Abraham Knowes or John Kessler, or from the evidence of all together, that Frederick Knowes entered into a contract with Webb, the agent for the Asylum Company, for the purchase of the land, to be either by word or writing, then the defence under the statute of limitations fails, and the plaintiff is entitled to recover.

Each bill of exceptions and the charge of the court were assigned for errors and argued by

*Ellis* and *Bellas*, for plaintiff in error.
*Frick* and *Greenough*, for defendant in error.

The opinion of the court was delivered by

HUSTON, J.—Archibald M'Call claimed the land in dispute as having been the property of John Nicholson, once comptroller-general of Pennsylvania, and who being, on settlement of his accounts, found largely indebted to the state, certain laws were passed and proceedings had, under which certain lands, and his interest in certain lands were sold, and the title to the tract in question deduced

to A. M'Call the plaintiff below.   In order to understand the matter in contest, it will be necessary to state the outline of a course of legislation on the subject of accounts with public officers, and it will be only an outline; to go into detail and cite all the laws and all the proceedings, would be to write a book, not a judicial opinion.   Those laws began with the first constitution in 1776.   The names and powers of the officers of the accounting department, have changed by different laws.   The comptroller-general had much of the power vested in him; the act of February 18, 1785, in some measure reduced former acts to one.   Many accounts from the then late war, were in a course of settlement, and the gradual but constant depreciation of the paper money of the war period, and also of an emission at the close of the war, made the settlement of accounts one of real difficulty.   This law allowed an appeal to the supreme court, and provided very minutely for the issue and trial.   Among other provisions of this act, it declared the balance found against any accountant, when confirmed by the executive council, to be a lien on all lands of the debtor in all parts of the state.   Of this act, Judge Smith, in the notes to his edition of the laws, page 27, says, the principles remain in force, though considerable alterations in manner of proceeding have taken place.

In 1789, the office of the register-general was established and a register-general appointed; to him all accounts thereafter settled were to be submitted before finally closed, and afterwards submitted to the supreme executive council.   In the same year certain duties, relating to these matters, were assigned to the state treasurer.

After the adoption of the constitution of 1790, all duties which had been allotted to the supreme executive council were transferred to the governor; *Act of September* 21, 1791; but accounts thereafter were to be referred to the governor, only in cases in which the comptroller-general and register-general should disagree.

This act gave to the comptroller-general power to proceed in a summary way for the collection of all balances from those indebted, or to direct the sheriff to take the body, and seize and secure the real and personal estate of all debtors, and if the debt was not secured in a certain period, to issue other process to sell the property, &c., &c.

In process of a few years, the settlement of the accounts of John Nicholson himself, became an important matter.   He was found to be a defaulter, and an act of assembly, April 20, 1795, was passed for the settlement of his accounts, which were to be submitted to the next legislature; it was in fact more to ascertain the propriety of an impending impeachment, than to affect the lien or the general law.

The act of April 4, 1792, introduces the general provisions for settlement of the accounts of all officers; by this, the comptroller-general is a prominent officer in the settlement of accounts.

For a reference and abstract of most of the laws on this subject,
     x.—2 p

I refer to Smith's Executors *v.* Nicholson, 4 *Yeates* 6. This case decided only the effect of the lien of the state.

The accounts were thus closed, but little or nothing was done as to collecting the debt. John Nicholson had lands in nearly every, or perhaps in every, county in the state; for some of them his title was perfect, for some it was only inceptive, held by articles of agreement; for some he had warrants and surveys, but no return of survey, because of non-payment of surveying fees; much of his land was incumbered by mortgages, and it was not easy to discover what was his property or the nature of his interest. On the 31st March 1806, an act was passed appointing Cadwallader Evans, John Steele and John Lyon, Esqs., commissioners, to obtain from the recorders and prothonotaries of the several counties, copies of all deeds and other writings relating to the estate of John Nicholson, and a transcript of every mortgage and judgment affecting his lands. The officers of the land office were directed to furnish copies of all papers in their offices which might disclose any of his estate. The commissioners were to ascertain the situation and value of the estate as far as practicable. To average the demand of the commonwealth on the whole of the several estates subject to the lien of the estate, and make report to the governor, who should cause to be sold, by the sheriff of the respective counties, according to due course of law, the several estates, or so much thereof as should produce the amount averaged or assessed as aforesaid, on each particular estate. And it was provided that when any person or persons, or managers of any of the land companies, who have any legal or equitable claim or interest in any particular estate, shall pay to the state treasury the amount of the state debt averaged on such estate or estates, or secure the same to be paid in two annual instalments, with interest; it shall be lawful for the said commissioners, or a majority of them, to transfer and set over the lien of the state thereon, to the sole use and benefit of such persons, or to the use of such company so claiming and paying as aforesaid. They had also power to compromise disputes, to purchase property sold by the sheriff, which they believed was selling at an under value, but these purchases in all cases to be for the use of the commonwealth. The commissioners were to take an oath diligently, faithfully and impartially to perform the several duties, and in case of vacancy from any cause, the governor to appoint so as to fill the place. See eighth volume of *Bioren* 166, and the following pages, for other provisions not material here.

At that period there was so much back land, and so few persons disposed to purchase for cash, that it was soon found to be probable that the whole land would not pay the debt, and it was useless as well as impracticable to average, as was proposed by this law. To sell in due course of law, seemed to require a *fieri facias* levy, and inquisition, and on return of this a *venditioni exponas* sale and deed; and to go through the counties of this state in

[M'Henry v. M'Call.]

succession, in this way, would require some twenty or thirty years, during which the state must pay the taxes, the land lie uncultivated, or become possessed by squatters, and the debt doubled by interest, payment of taxes and costs. This produced the act of March 1807. This act authorized the commissioners to proceed and sell the lands of John Nicholson, or his interest in them, on giving the notice therein prescribed; but this act did not abridge the powers of the commissioners to compromise under the last mentioned act.

The second section directs the terms on which the sales shall be made, for cash or bonds, with security, bearing interest; and where bonds were given, directs a certificate of purchase to be delivered to the buyer, and when the money is paid, a deed to be executed, *"for such estate as the said John Nicholson had and held the same at the commencement of the lien of the commonwealth against the estate of the said John Nicholson, which said conveyance or copies of the record thereof, shall be prima facie evidence of the grantee's title,"* subject, however, to payment of any arrears of the purchase-money.

The third section authorizes the sale by large bodies or single tracts. The fourth section again relates to their power to compromise, and " upon any compromise made with any person or persons, and commissioners or a majority of them, at the request of the parties, and upon their paying or securing the perchase-money, may and shall execute an assignment, under their hands and seals, of so much of the lien of the commonwealth, against the estate of the late John Nicholson, as may be equivalent to the consideration paid or secured to be paid to the state by such party; and from the date of such assignment, the whole amount thereof shall be principal bearing interest, *and the holder or holders of such assignment, or his or their assigns, may at any time proceed upon the liens of this commonwealth to sell the lands which may constitute the subject of such compromise."*

The seventh section relates to the Asylum Company, and that the said company had refused to the commissioners the necessary information as to the lands claimed by it, and the interest of John Nicholson in said lands, and it provides that the president and managers of the Asylum Company shall within three months from the passage of this act, deliver or cause to be delivered to the secretary of the commonwealth, an exact copy of their transfer book or register of shares in the stock of said company, which may have been transferred by the company to individuals, *or by individuals to the company*, or to other individuals.

(I understand what is called the " large document," to contain a list and description of warrants, surveys and patents, conveyed by John Nicholson to the company, or perhaps it is the list of lands belonging to the company, required by the eighth and following sections.)

The eighth section requires the company to file in the office of

[M'Henry v. M'Call.]

the secretary of state, a schedule of lands now or at any time here-tofore claimed and held by said company, exhibiting the quantity and local situation of each body of land; and also a specification of their title to each body or tract; and if any lands have been trans-ferred by any other person than said John Nicholson to the said company, or in trust for them, and whether these transfers were made on a contract with the company, or in pursuance of some previous contract with John Nicholson.

The ninth section states what shall be the consequence if the company refuse to comply with this act, and concludes with a pro-viso, that if the said commissioners and company shall compromise the difficulties by this act, intended to be remedied, this act, as far as respects said company, shall be null and void.

They did compromise on the 18th of March 1808. The agree-ment of compromise and payment to the state of above 20,000 dol-lars, was given in evidence, and a transfer of the lien of the state on the lands of the company, for so much, was made by the com-missioners.

On March 24, 1808, 8 *Bioren* 416, another act of assembly was passed, in which, after stating that the preceding acts were found not so well adapted to the end designed, for want of a more specific designation of the mode of sale, to be adopted and pursued by the person or persons who have or may become parties to such settle-ment or compromise, therefore it was enacted, that any person or persons, and the majority of such persons, where there are more than two, and the survivor and survivors of such persons, as may have or shall hereafter become a party to any settlement or com-promise, with the said commissioners, shall have the same powers and authority as the said commissioners, or a majority of them, have by the several acts of assembly of this state, upon process granted by the governor as therein prescribed, to make and carry into effect a sale of such warrants, lands, tenements and heredita-ments, estate and interest whatsoever, which John Nicholson, late deceased, had any claim or interest in, and which may be the sub-ject of such settlement or compromise respectively.

We now come to the evidence offered in this case, which was excepted to, and bills of exceptions, which, after stating the evi-dence offered, I shall notice. The plaintiff read five several patents to John Nicholson, for tracts, in the names of William Montgomery, Hannah Montgomery, John Montgomery and John Young. March 3, 1796, settlement of John Nicholson's account, by John Donald-son, comptroller-general. March 3, 1796, entered in register-gene-ral's office, by S. Bryan, register general, 58,429 dollars 24 cents. December 20, 1796, account settled by register-general, balance 51,209 dollars 22 cents. (There is some confusion in the paper book before me, as it referred to evidence given in another cause, not before us; perhaps the amounts above are not the final settle-ment, but 63,729 dollars 86 cents.)

They then gave in evidence, what is called the large document, certified from the office of the secretary of state, containing lists of lands compromised by the state commissioners, C. Evans, J. Lyon and Joseph Hiester, (appointed instead of J. Steele) and A. M'Call, J. Ashley and T. Astley.    March 18, 1808, the compromise.    April 4, 1808, copy of commission, by governor M'Kean, to J. Ashley and Thomas Astley, authorizing them to make sale of the lands embraced in the compromise.    November 23, 1808, return of sale under this compromise.    June 25, 1808, deed, M'Call, Ashley and Astley to William J. Bell.    January 14, 1809, this deed acknowledged.    November 20, 1813, recorded in Northumberland county. January 17, 1809, deed, William J. Bell to A. M'Call, J. Ashley and T. Astley, from record book D, 439.    May 15, 1823, deed, M'Call, Ashley and Astley, trustees of the Asylum Company of the first part, and M'Call, Ashley and Astley and James Gibson, managers of said company, of the second part, and Thomas Newman of the third part.    May 21, 1823, assignment of said deed, Thomas Newman to Archibald M'Call.

To all this evidence, the many exceptions amounted to this:— That where a special power over lands of another is given, the power must appear to have been strictly pursued, and every minute step distinctly proved, and cases from our reports, in which this doctrine is repeatedly laid down, as to sales of lands, were cited.

In 13 *Serg. & Rawle* 208, the present chief justice recognizes these decisions on common law principles, and also the power and the propriety, if not necessity, of the legislature altering the law on this subject.    Where there had been an observance of the most minute details, it was nearly impossible to perpetuate the evidence of the facts, or as the burden of proving them lay on the purchaser, to show a title on which he might recover.    The legislature interposed, and at length succeeded in placing the matter on just ground, as regarded the owner, and in providing an effectual remedy for the purchaser by the fourth section of the act of March 13, 1815, provided a tax was due on the land and unpaid at the time of the sale.

The objection above stated, and the difficulty it would occasion, were foreseen by the legislature, and they have met and obviated it in the second section of the act of March 19, 1807, above cited, where they say *the conveyance of the commissioners for the state, or copies of the records thereof, shall be prima facie evidence of the grantee's title,* and in the last law where the same power and authority is given to those who compromise, to convey and carry a sale into complete effect.    The deeds then made under the laws referred to, are *prima facie* evidence of title in the grantee, and until some proof impugning this is given, the grantee is not bound to show a strict compliance with every thing prescribed by the several laws on the subject.    Although this naked question has not before been

x.—2 p*

brought before this court, the doctrine here laid down has been deci-
ded in the common pleas repeatedly, and although able counsel were
engaged, the point was not so much doubted as to induce them to
advise a writ of error. I recovered several tracts for Mr Grant
and Mr Rawle, on the deed alone, in Centre county, before Judge
Walker.

This matter of the lien of the state, was settled by the then
supreme court in 1803, 4 *Yeates* 6; and the whole question of lien
and proceedings were supported in the supreme court of the United
States, 7 *Peters*. It is time it should be considered settled.

The next matter to be considered, is an objection to all the deeds,
above mentioned, subsequent to the compromise and sale under it,
on the warrant of Governor M'Kean to the persons with whom
the compromise was made, that is, by Ashley, Astley and M'Call
to William J. Bell, and from him through several persons, until at
length the title is vested in Mr M'Call the plaintiff. And here again
I have to regret, that neither the deeds, nor any abstracts of them
more full than is above stated, were submitted to us. The point
however, is not new; it has been before us in several cases, from
the case of the trustees under the assignment of Mr T. Coxe, down
to the case of the Dauphin and Susquehanna Coal Company, in 9
*Watts*.

The deed of trustees conveys the legal title, and the legal title
will support an ejectment against a stranger to the trust and wrong-
doer. If those beneficially interested are in possession, or interested
against him having the legal title, a different question would be
presented; if the trustees convey improperly, they may be answer-
able to those in interest, or, on complaint, may be removed; but it
is not for a stranger to call for a fulfilment of trusts, or object to a
title, legal on its face, because of a surmise of a violation of the
rights of those for whose use the suit is brought, and who them-
selves do not object. There is also a string of objections to deeds
from John Nicholson to Robert Morris, and from Nicholson and
Morris, or one of them, to Jared Ingersoll and M. Clarkson, and
from these again to John Ashley, Thomas Astley and A. M'Call for
the Asylum Company. The preceding objections apply to these,
and, in addition, the commissioners of the state treated with those
gentlemen, and conveyed to them on the compromise, as trustees of
the Asylum Company; they accepted the deed as such, and conveyed
as such, and no third person, no one not interested in the company,
can dispute that they were trustees. The objection, that all the
deeds and documents recited were not produced, was not pressed.
It would introduce strange effects, if every person showing title and
possession, or where the lands are uncultivated, superintendence
and payment of taxes, must go back and produce his deeds and
evidence of the truth of all recitals from 1782, or any period beyond
twenty-one, or at farthest forty years.

The rest of the case presents much evidence as to the acts of the

agents of the Asylum Company, and some 'evidence of those under whom the defendants claim, having become tenants of the company; and some evidence contradicting this; all this was left to the jury. Before I come to this, I must notice, that on offering Samuel Webb as a witness, to prove what occurred as to a purchase, plaintiff offered to show a written authority to him to act for the company; it was objected that a corporation can only act under its seal. To this the answer is, that it is not always the law; many acts may be done by a corporation not evidenced by its seal; among which may be the appointing an agent to pay taxes, resurvey lands, and even agree with settlers to go on it, but the conclusive answer is, that *this company was not a corporation.*

The defendants submitted to the court certain points and errors assigned in the answer to the second point, and to a part of the general charge.

The first we have observed on already. The second, and the answer to it, are mainly relied on. All those conversant in our courts know, that great astuteness is sometimes exhibited in drawing the points to which answers from the court are requested. Saying that the evidence will justify the jury in finding that, the possession of defendants and Knowes (under whom the principal defendant M'Kinstry claimed) was adverse to plaintiff's title, does not at first view appear to be very different from saying—it is a question of fact for you to determine whether it was adverse to the plaintiff or not. The court thought, however, that there was some difference, and told the jury, that if they believed the evidence, they might find the other way, *without stating the whole of the evidence on this* subject, which was very voluminous. I have truly stated there was some contrariety in it—it seemed clear, that when defendants began to work on the land, all knew it to be warranted and surveyed, though perhaps none of them knew who was the owner, it was positively sworn, that when Webb came as agent of the company, and told who was the owner, they agreed to purchase, but could pay nothing; they were poor, but the price was agreed on, and when they could pay ten per cent. they were to have a written title; it was proved, and was matter of notoriety, that the failure of Nicholson and Morris, the principal owners, the lien of the state, and consequent uncertainty of title, occasioned delay. There was proof that the settlers, who had agreed with Webb less than twenty-one years ago, at length began to hope they would hear no more of the Asylum Company, and agreed to hold by settlement. The answers to all points on the same subject are to be taken together. On the third point, the court said a parol acknowledgment, to take a case out of the statute, must be such acknowledgment as to show that the defendant did not intend to hold adversely to, but under the plaintiff's title, and such as to induce the plaintiff to believe that he did so hold under it. This was all the defendant asked. A jury is supposed not to be hostile to a neighbour: once tell them,

not that they must weigh all the evidence and draw a fair conclusion, but that they may look at part of the evidence, and will be justified in finding on it, and we change the law, and the change will not be an amendment. The judge would not have done exactly his duty, if he had stopped at his answer to the second point; but he answers the third, and then says, in substance, I have told what agreement and understanding are sufficient to take a case out of the statute, and you are to consider all the evidence, and if from the whole of it you believe the defendants did make an agreement, understood by all, to purchase on the terms and in the manner stated, and this within twenty-one years before bringing the suit, the statute of limitations does not protect them.

Judgment affirmed.